## APPEAL OF NICE BALL BEARING CO.

Docket No. 2109.   Decided November 12, 1926.

1. PATENT VALUES.—For the purposes of invested capital and allowance for exhaustion, the values of patents acquired by a corporation for stock at some prior date determined upon the evidence of earnings produced by the use of such patents in the hands of their former owners, the opinion evidence of men experienced in the business using such patents, and comparison with the profits produced by the purchasing corporation in subsequent years.

2. GOOD WILL.—The good will of a going business based exclusively upon the manufacture and sale of articles protected by patent monopoly and transferred to a successor corporation for stock can not be determined in the absence of specific testimony distinguishing the value of the good will as separate from the value of the patent monopoly.

3. LOSSES; DEDUCTION.—No part of the amount paid in 1921 in compromise of litigation can be an allowable deduction from gross income for the years 1918 and 1919 although the cause of the litigation arose in those years but no liability was then acknowledged or accrued.

4. JURISDICTION.—Under both the Revenue Acts of 1924 and 1926 the Board has jurisdiction of an appeal involving an alleged deficiency in tax, the assessment of which was made prior to June 2, 1924, and a claim for abatement of such assessment was rejected during 1925.

5. STATUTE OF LIMITATIONS.—A deficiency for the calendar year 1916 was not discovered until July, 1920, and was not assessed until subsequent to December 23, 1924. *Held*, that the statute of limitations had run against any alleged deficiency for the year 1916.

*Andrew R. McCown, Esq.*, and *Chas. S. Rockey, C. P. A.*, for the petitioner.

*A. R. Marrs, Esq.*, for the Commissioner.

The taxpayer brought this proceeding for the purpose of a redetermination of alleged deficiencies as follows: For the year 1916, $1,884.08; for the year 1917, $16,253.32, being the amount for which a claim for abatement of $17,374.73 was rejected by the Commissioner; for the year 1918, $11,861.31; for the year 1919, $24,787.04, aggregating $54,785.75.

The issues presented for determination are:

(1) The value of certain patents acquired by the taxpayer for stock.

(2) The value of the good will of two predecessor businesses acquired by the taxpayer for stock.

(3) The taxpayer's claim that the sum of $100,000 paid in 1921 in settlement of litigation should be prorated over the years 1918, 1919, 1920, and 1921, during which the subject of the litigation was in controversy.

At the hearing the Commissioner moved to dismiss the petition as to the year 1917, claiming that the Board had no jurisdiction over an appeal for that year. At the same time the taxpayer claimed the benefit of the statute of limitations as regards the year 1916, but proceeded nevertheless to the trial of the issues on the merits for all of the years 1916 to 1919, inclusive.

1. The taxpayer is a corporation organized under the laws of Pennsylvania, having its principal place of business at Philadelphia. It was incorporated on January 18, 1916. At or about the time of its organization it acquired all the properties and the going business, including good will, of the Pressed Steel Manufacturing Co., a corporation. At the same time it acquired all the properties and the going business, including good will, of one Budd G. Nice, doing business under the name and style of Nice Ball Bearing Co. For all of these properties and businesses it paid, or undertook to pay, a small amount of cash, assumed some then outstanding obligations, and issued a large portion of its authorized capital stock. Shortly thereafter it acquired from Frank Beemer two certain patents for which it issued $100,000 of its common stock, and at the same time it acquired from Budd G. Nice two certain patents for which it issued $50,000 par value of its authorized capital stock.

The Pressed Steel Manufacturing Co. was incorporated in the year 1902 and had been continuously in business from that time to the transfer of its business to the taxpayer. It had acquired the ownership of a number of patents and some tangible properties. Its principal business, however, was that of a selling organization. In connection with its merger with the taxpayer it submitted a written offer of sale of its property and business, the pertinent parts of which are as follows:

We do hereby agree to sell, assign and transfer unto the Nice Ball Bearing Company, Incorporated, our entire business now being carried on by us in Philadelphia, Penna., consisting of the promotion and sale of Ball Bearings, now being made for us by other concerns under contract, and for which we own very valuable and exclusive patents, consisting of the following assets:

| | |
|---|---:|
| Tools | $12,169.54 |
| Insurance | 1,971.00 |
| Cuts and electros | 469.52 |
| Drawings | 867.00 |
| Merchandise, finished | 14,684.56 |
| Stationery and office supplies | 346.57 |
| Office furniture | 2,938.25 |
| Cash | 421.59 |
| Accounts receivable | 21,748.92 |
| Patents and trade-mark | 178,335.63 |
| Good will—based inter alia on a total of approximately $90,000 of unfinished orders on our books for redelivery during the year 1916, on which the estimated profit is $50,000; as well as on the volume of profit obtained on the amount of business we transact, and by the trade name we have built up at great expense and care during the past fourteen years | 271,109.35 |
| | 505,061.93 |

This offer was accepted by the taxpayer and payment was ordered made therefor as follows:

690 shares common stock, par value $100_____ $69,000
690 shares preferred stock, par value $100_____ 69,000
1,750 shares common stock, par value $100 (after increase
   of capitalization) _____ 175,000
1,750 shares preferred stock, par value $100 (after increase
   of capitalization)_____ 175,000
                                               $488,000.00
Assumption of outstanding indebtedness_____ 17,061.93

   Total_____ 505,061.93

The patents purchased by the new corporation upon its incorporation as of January 18, 1916, the serial numbers, the dates of issue, and the par value of stock of such new corporation issued therefor are as follows:

| Serial number | Date issued. | Stock issued. | |
|---|---|---|---|
| 859099_____ | July 2, 1907 | $10,000.00 | Ball-bearing wheel. |
| 953433_____ | Mar. 29, 1910 | 1,000.00 | Carpet fastener; not used after 1912. |
| 735529_____ | Aug. 4, 1903 | 50.00 | Not used. |
| 811152 _____ | Jan. 30, 1906 | 50.00 | Not used. |
| 887265 _____ | May 12, 1908 | 100,000.00 | Stamped thrust bearings. |
| 859083_____ | July 2, 1907 | 65,000.00 | Radial thrust bearing. |
| 871518_____ | Nov. 19, 1907 | 2,235.63 | Rubber-tired skate wheel. |
|    Total_____ | | 178,335.63 | |

The earnings before amortization of patents, except as to 1915, and net tangibles of the Pressed Steel Manufacturing Co. over the five-year period from 1911 to 1915 were as follows:

| Year. | Earnings. | Net tangibles. |
|---|---|---|
| 1911_____ | $19,260.49 | $24,367.52 |
| 1912_____ | 22,855.38 | 32,046.50 |
| 1913_____ | 25,173.44 | 47,186.34 |
| 1914_____ | 18,218.97 | 62,667.81 |
| 1915_____ | 14,294.02 | 38,555.08 |
| | 99,802.30 | 204,823.19 |

Said earnings for 1915, namely, $14,294.02, are the net earnings after claimed amortization of patents in the amount of $17,833.56. The earnings for 1915, therefore, before amortization of patents, amounted to $32,127.58, and the total of the column of earnings upon this basis is $117,635.86.

All the patents transferred to the taxpayer with the exception of three, for which a nominal amount of stock was issued, played an important part in the business of the taxpayer.

Serial No. 859,099, for which $10,000 stock was issued, was a patent for a ball bearing wheel. This was issued for invalid chairs

and other various small vehicles. This wheel was also used in transveyor trucks.

Serial No. 953,433, for which $1,000 stock was issued, was a pressed steel carpet fastener for use on stairways. The use of this patent, however, was discontinued after 1912.

Serial Nos. 735,529 and 811,152, for which $50 stock was issued for each, were not used.

Serial No. 887,265, for which $100,000 stock was issued, was a stamped thrust bearing. This was next to the most important patent used by the taxpayer. It was used in the hinge and sash bearing business, stearing gears, marine motor thrust bearing, king pin, tractor thrust, elevator thrust, revolving doors and ceiling fans.

Serial No. 859,083, for which $65,000 stock was issued, was a radial thrust bearing. This was sold to street car manufacturers. It was also used for baby carriages, radiator fans, washing machines, electric fans, electric flasher signs and ship windlass bearings.

Serial No. 871,518, for which $2,235.63 of stock was issued, was a ball bearing roller skate patent. This was a combined unit of five distinct parts into a single wheel.

The business of Budd G. Nice, trading as Nice Ball Bearing Co., was first established in or about May, 1914. At the time of the merger of this business with the taxpayer, Nice submitted a written offer of sale of all of his properties and business, the pertinent parts of which are as follows:

I hereby agree to sell, assign and transfer to the Nice Ball Bearing Company, incorporated, the entire business now carried on by myself, trading as Nice Ball Bearing Company, located at the northwest corner of 25th and Lombard Streets, Philadelphia, Penna., for the manufacture of ball bearings, their parts and accessories, consisting of the following:

| | |
|---|---:|
| Machinery | $34,311.30 |
| Tools (finished) | 2,573.84 |
| Tools (unfinished) | 258.10 |
| Factory equipment | 194.85 |
| Merchandise | 12,960.34 |
| Insurance (unexpired) | 108.77 |
| Office furniture | 568.54 |
| Cash | 37.85 |
| Factory improvements | 1,310.75 |
| Good will—which is based on a total of approximately $138,000 of unfinished orders on my books for delivery during the first nine months of the year 1916, on which the estimated profit is approximately $60,000 | 89,518.21 |
| | 141,842.55 |

This offer was accepted by the taxpayer and payment was ordered made therefor as follows:

560 shares common stock, par value $100_____ $56,000.00
560 shares preferred stock, par value $100_____ 56,000.00
                                                                        _____
                                                                        112,000.00
Assumption of outstanding obligations_____ 7,603.23
Cash payment within two years_____ 22,239.32
                                                                        _____
    Total_____ 141,842.55

On or about March 16, 1916, the taxpayer acquired from Frank
Beemer and Budd G. Nice four other patents, in payment for which
it issued its stock. The patent serial numbers, the dates of issue, and
the par value of stock issued therefor are as follows:

| Serial number. | Date issued. | Prior owners. | Stock issued. | |
|---|---|---|---|---|
| 1,149,889_<br>1,242,911_ | Aug. 10, 1915<br>Oct. 16, 1917 | }Frank Beemer_____ | $100,000 | {Annular roller bearing.<br>{Diamond retainer. |
| 1,147,116_<br>1,177,046_ | July 20, 1915<br>Mar. 28, 1916 | }Budd G. Nice_____ | 50,000 | {Pressed steel annular bearing.<br>{Single row type ball bearing wheel. |
| Total_____ | | | 150,000 | |

Foreign rights were likewise acquired at the same time and patents
were immediately procured in England, France, Italy, and Canada.

Serial No. 1,149,889 was secured from Frank Beemer. This patent
was known as the annular roller bearing. This was used in heavy
machinery, such as concrete machinery, bait overhead cranes, pro-
peller shafts, and other heavy machinery.

Serial No. 1,242,911 was a patent also secured from Beemer and
was known as the diamond ball retainer patent. For these two
patents $100,000 stock was issued.

Serial No. 1,147,116 covered a thrust steel annular bearing and was
secured from Budd G. Nice. This was used in washing machines,
cream separators, oil separators, and floor surfacing machines.

Serial No. 1,177,046 was a patent also secured from Budd G. Nice.
For the two latter patents $50,000 stock was issued. This latter
patent was a single row type ball bearing wheel used mostly in over-
head traction work, in overhead conveyers, sliding doors, etc. The
most valuable patent used by the taxpayer was the one secured from
Frank Beemer.

Budd G. Nice transferred his bearing patent and an application
for a patent on an anti-friction wheel to the taxpayer corporation for
stock of the par value of $50,000. During the years 1914 and 1915
the predecessors, under a shop license, manufactured through others
and sold bearings and wheels to the amount of $11,240, of which the
profit was $6,925, which was a sales profit only as the predecessors
had their manufacturing done by others; book and unfilled orders,
requiring material made under this patent and application therefor,
taken over by the taxpayer from the Pressed Steel Manufacturing

Co., amounted to $9,166, on which the estimated profit was $5,210, which profit was made thereon by the taxpayer.

Frank Beemer transferred an annular rolling bearing patent and an application for a pressed or stamped ball retainer patent to the taxpayer corporation for stock of the par value of $100,000. During the years 1914 and 1915 the business of Budd G. Nice, trading as Nice Ball Bearing Co., was increased from approximately $27,000 in 1914 to $75,000 in 1915, largely because of the use of such ball retainer invention. The amount of business booked for 1916 in which the said retainer was used exceeded $140,000 and the total sales on the said inventions of Beemer in the year 1915 amounted to $11,300. The predecessors had a shop license for such inventions but had no title thereto, and the patents were not included in the original transfer and sale of the assets of the two predecessor businesses to the taxpayer in January, 1916.

The earnings of the taxpayer corporation and the net tangibles for the five-year period subsequent to its acquisition of the patents and other assets upon its organization in January, 1916, to wit, from 1916 to 1920, inclusive, as shown by its tax returns (and as adjusted by the Commissioner of Internal Revenue with respect to the years 1916 to 1919, inclusive) before amortization of patents, are as follows:

| Years. | Earnings. | Net tangibles. |
|---|---|---|
| 1916 | $158, 805. 25 | $61, 036. 81 |
| 1917 | 93, 065. 67 | 193, 592. 06 |
| 1918 | 70, 409. 84 | 272, 746. 62 |
| 1919 | 175, 882. 45 | 322, 091. 57 |
| 1920 | 129, 850. 53 | 468, 757. 33 |
| Total | 628, 013. 74 | 1. 318, 224. 39 |
| Average | 125, 622. 75 | 263, 644. 88 |

The amortization charge in each of said years was $28,967.02.

The taxpayer never manufactured or sold any articles except under its said patents or patent applications. The gross sales under the patents or patent applications transferred to the taxpayer corporation by Budd G. Nice and Frank Beemer and the Pressed Steel Manufacturing Co. for the five-year period subsequent to the acquisition of them by the taxpayer was as follows:

| | Pressed steel patents (7). | Frank Beemer patents (2). | Budd G. Nice patents (2). | All patents. |
|---|---|---|---|---|
| 1916 | $294, 042. 97 | $42, 838. 9 | $20, 061. 01 | $356, 942. 97 |
| 1917 | 283, 041. 87 | 65, 404. 36 | 18, 846. 04 | 368, 292. 27 |
| 1918 | 376, 362. 03 | 113, 923. 26 | 22, 178. 28 | 512, 463. 57 |
| 1919 | 617, 774. 86 | 356, 054. 77 | 28, 150. 53 | 1, 001, 980. 16 |
| 1920 | 725, 261. 34 | 375, 041. 20 | 44, 670. 86 | 1, 144, 973. 40 |
| Total | 2, 296, 483. 07 | 953, 262. 58 | 133, 906. 72 | 3, 383, 652. 37 |

At the time of the acquisition by the taxpayer of the said seven patents from the Pressed Steel Manufacturing Co., of said patent and application for patent from Budd G. Nice, and of said patent and application for patent from Frank Beemer, and of the other assets acquired from the predecessor businesses, the taxpayer (purchaser) and the sellers knew from statistical records the percentage of the bearing business had by the predecessors under said patents and patent applications, with respect to the total business in the bearing industry, for the year prior to said acquisition, and as well the probable increase of such business by the taxpayer. The position of the taxpayer and/or its predecessors in the bearing industry, as to twenty-two different kinds of bearings, as shown by the percentage of business had by taxpayer and/or its predecessors with respect to the total business in the industry, for the years 1915 to 1919, inclusive, is as follows:

| | 1915 | 1916 | 1917 | 1918 | 1919 |
|---|---|---|---|---|---|
| | Per cent | Per cent | Per cent | Per cent | Per cent |
| Street car bearings | 98 | 98 | 98 | 98 | 98 (a) |
| Clutch throwout bearings | 20 | 35 | 60 | 65 | 70 (a) |
| King pin bearings | 98 | 98 | 98 | 98 | 98 (a) |
| Baby coach bearings | 98 | 98 | 98 | 98 | 98 (a) |
| Timer bearings | 60 | 60 | 60 | 60 | 40 (a) |
| Steering gear bearings | 20 | 35 | 60 | 65 | 70 (a) |
| Radiator fan bearings | 40 | 30 | 25 | 20 | 15 (b) |
| Washing-machine bearings | 35 | 40 | 55 | 75 | 85 (a) |
| Transveyor truck wheels | 35 | 40 | 45 | 45 | 50 (b) |
| Electric fan bearings | 98 | 98 | 98 | 98 | 98 (a) |
| Automobile generator thrust bearings | 35 | 35 | 40 | 70 | 70 (a) |
| Tractor thrust bearings | 10 | 25 | 30 | 30 | 25 (a) |
| Marine engine bearings | 25 | 25 | 20 | 50 | 35 (a) |
| Electric flasher sign bearings | 90 | 95 | 30 | 35 | 50 (b) |
| Elevator thrust bearings | 15 | 25 | 20 | 20 | 40 (b) |
| Hinge and sash bearings | 0 | 15 | 20 | 20 | 85 (b) |
| Revolving door bearings | 10 | 20 | 20 | 20 | 40 (b) |
| Ship windlass bearings | 30 | 35 | 40 | 40 | 20 (b) |
| Electric and other coffee grinder and feed mill bearings | 15 | 25 | 35 | 35 | 30 (b) |
| Ceiling fan bearings | 20 | 20 | 20 | 20 | 25 (b) |
| Ventilator bearings | 15 | 25 | 30 | 30 | 20 (b) |
| Conveyor system wheel bearings | 25 | 25 | 40 | 45 | 50 (b) |

As to the above items marked (a) the table shows percentage of total particular units manufactured which used bearings, such as steering gears, etc.; the remainder in percentage of such units did not employ bearings therein so that taxpayer supplied all of such business where bearings were used, as to steering gears, radiator fan bearings, transveyor truck bearings, electric flasher bearings, elevator thrust bearings, hinge and sash bearings, revolving door bearings, ship windlass bearings, electric and other coffee grinder and feed mill bearings, ceiling fan bearings, and conveyor system wheel bearings.

As to the above items marked (b), the table shows the percentage of total particular units which used bearings manufactured by tax-

payer so that taxpayer did not supply all of such business where bearings were used but only the percentage thereof indicated.

During the years 1911 to 1915, inclusive, the net tangible assets employed in the business of the Pressed Steel Manufacturing Co., the net profits produced before amortization of patents, the amount of 8 per cent of return on net tangibles, and the balance of profits were as follows:

| Year. | Net tangibles. | Net earnings before amortization of patents. | 8 per cent on net tangibles. | Balance of earnings. |
|---|---|---|---|---|
| 1911 | $24,367.52 | $19,260.49 | $1,949.40 | $17,311.09 |
| 1912 | 32,046.50 | 22,855.38 | 2,563.72 | 20,291.66 |
| 1913 | 47,186.34 | 25,173.44 | 3,774.90 | 21,398.54 |
| 1914 | 62,667.81 | 18,218.97 | 5,013.42 | 13,205.55 |
| 1915 | 38,555.02 | 32,127.58 | 3,084.40 | 29,043.18 |
| Totals | 204,823.19 | 117,635.86 | 16,385.84 | 101,250.02 |
| Average | 40,964.64 | 23,527.17 | 3,277.17 | 20,250.00 |

During the years 1911 to 1915, inclusive, the net tangible assets employed in the business of the taxpayer, the net profits produced before amortization of patents, the amount of 8 per cent of return on net tangibles, and the balance of profits were as follows:

| Year. | Net tangibles. | Net earnings before amortization of patents. | 8 per cent on net tangibles. | Balance of earnings. |
|---|---|---|---|---|
| 1916 | $61,036.81 | $158,805.25 | $4,882.94 | $153,922 31 |
| 1917 | 193,592.06 | 93,065.67 | 15,487.36 | 77,578.31 |
| 1918 | 272,746.62 | 70,409.84 | 21,819.73 | 48,590.11 |
| 1919 | 322,091.57 | 175,882.45 | 25,767.32 | 150,115.13 |
| 1920 | 468,757.33 | 129,850.53 | 37,500.58 | 92,349.95 |
| Totals | 1,318,224.39 | 628,013.74 | 105,457.93 | 522,555.81 |
| Average | 263,644.88 | 125,602.74 | 21,091.59 | 104,511.16 |

2. The Pressed Steel Manufacturing Co., one of the predecessors, had been in business for fourteen years at the time all of its assets were transferred to the taxpayer. It owned at such time the trademark "Nice," which was registered in the United States Patent Office, and which was transferred to the taxpayer upon its incorporation. It was a successful, going concern and at such time it had on its books $90,000 of unfilled orders on which the estimated profit was $50,000, and which were likewise then transferred to the taxpayer. Such orders were consummated by the taxpayer and the profits thereon exceeded said estimated profit. Said business at the time of the transfer thereof to the taxpayer was transferred at the value of $505,061.93, of which $271,109.35 was good will, $178,-

335.63 was for patents, and the balance of $55,619.95 was for tangible assets at the book value which was the cost value.

The business of Budd G. Nice, trading as the Nice Ball Bearing Co., at the time of its transfer to the taxpayer, included no patent account, but did. include $138,000 of unfilled orders on which the estimated profit was $60,000. Such orders were consummated by the taxpayer and the profits thereon exceeded said estimated profit. Three months prior to the transfer of said business said Budd G. Nice had received an offer for said business from a responsible party in the amount of $175,000. Said business at the time of the transfer thereof to the taxpayer was transferred at the value of $141,842.55, of which $89,518.21 was good will and the balance, $52,323.79, consisted of tangible assets at cost, and the business at the time of the receipt of the offer of purchase therefor of $175,000 was the same business and consisted of the same assets.

3. On or about the 13th day of April, 1917, a contract was entered into with William Steel & Sons Co. for the erection of a one-story steel and concrete building which was finished on or about September 1, 1917. This building was built on the "cost plus" basis. The estimated cost was $187,000. The final cost was $290,000. The contractor had agreed to finance the construction to a large extent by mortgage, but was unable to place the mortgage on account of the Liberty Loan drives and finance conditions at that time. The contractor brought a suit for the unpaid balance of $230,000. An attempt to adjust this suit by a deed of the real estate to the contractor was objected to by the bank and by merchandise creditors of the taxpayer. The creditors entered into an agreement but the contractor refused to enter with them and threatened to proceed with the suit. Thereupon, the taxpayer secured one Kirkbride, the president of the so-called "bearing trust," to purchase the contractor's building debt, taking an assignment of the taxpayer's real estate. A voting trust was created, by the terms of which the voting stock of the taxpayer corporation was transferred to the said Kirkbride. There was litigation with Kirkbride as to the final payments and the return of stock and a number of suits were pending in various courts. Finally, a compromise was effected for $100,000 and suits between all the parties were settled, discontinued and entered of record. Final agreement was made December 1, 1921, $50,000 cash was paid in December, 1921, and a note for the remaining $50,000 was given, which was paid January 2, 1923. These payments were confirmed by the stockholders and directors of the taxpayer. This $100,000 was allowed as a deduction from the gross income of the taxpayer for the year 1921, but the taxpayer claimed that said sum should have been

allocated to the years 1918 to 1921, inclusive. The books of the taxpayer were kept on the accrual basis.

4. For the year 1917, upon the basis of original and amended income-tax returns made by the Commissioner and a report made by an examining agent, the Commissioner made original and additional assessments aggregating $25,924.62. Against the total of these assessments the taxpayer at some time prior to December 23, 1924, made and filed with the Commissioner a claim for the abatement of $17,374.73. The deficiency letter dated December 23, 1924, recites the allowance of said claim in the amount of $1,121.41 and its rejection in the amount of $16,253.32.

5. For the year 1916 the taxpayer's original income-tax return, made February 21, 1917, was filed in the office of the collector of the first district of Pennsylvania on February 22, 1917, showed a net taxable income in the amount of $35,633.77, and computed the amount of tax due as $712.68. Thereafter, and on or about July 28, 1920, a revenue agent investigated the taxpayer's books and records and concluded that there was an additional tax of $1,884.04. At his suggestion the president of the taxpayer signed an amended return prepared by the agent for the calendar year 1916, which showed a taxable income in the amount of $129,838.23 and a total apparent tax for that year of $2,596.76. This return was forwarded by the agent to the Commissioner with his report of July 21, 1920. Thereafter, the Commissioner considered the question of tax liability for the year 1916, and on December 23, 1924, mailed to the taxpayer a notice of deficiency, registered, advising it of his determination of a deficiency of $1,884.04. No assessment of the deficiency for that year was made prior to December 23, 1924.

At the trial of this proceeding and for the purpose of supporting the taxpayer's claims to patent values, the earnings and profits as shown in the above-mentioned amended return have been used by taxpayer as part of a proposed basis for computing values of the taxpayer's intangible properties consisting of both patents and good will.

In making his adjustments of invested capital and allowances for exhaustion of patent values, the Commissioner found that all the patents acquired by the taxpayer for stock had at the date acquired a cash or fair market value in the amount of $86,000 and allowed no value whatever for the good will of the predecessor businesses taken over. The Board finds that the group of seven patents acquired by the taxpayer from the Pressed Steel Manufacturing Company had a cash or fair market value at the date acquired in the amount of $178,335.63 and that the four patents and inventions acquired from

Budd G. Nice and Frank Beemer had a value at the date acquired in the amount of $150,000.

OPINION.

TRUSSELL: In view of the evidence we are of the opinion that the statute of limitations had run against the year 1916 and that there is no deficiency for that year.

The Commissioner urged, in support of his motion to dismiss the appeal for the year 1917, the fact that an assessment of the claimed deficiencies had been made prior to June 2, 1924. This motion was denied at the time of the hearing on the basis of the Board's decision in the *Appeals of E. J. Barry*, 1 B. T. A. 156, and *Hickory Spinning Co.*, 1 B. T. A. 409, and that conclusion is now affirmed in accordance with section 283(f) of the Revenue Act of 1926.

In the case of the *Malleable Iron Range Co.* v. *United States*, 62 Ct. Cls. 425, the Court of Claims had under consideration a situation where the plaintiff sought in its income-tax return for the year 1918 to deduct the amount of the judgment rendered against it during that year but in respect to which the plaintiff then took an appeal which was not finally determined and settled until the year 1920, and the court held that, inasmuch as the plaintiff in that case never acknowledged the liability until the appeal was determined, it could not accrue any amount on account of said judgment while its appeal was pending and unsettled. The record in the instant case does not show when the litigation which was compromised and settled in 1921 was actually begun. It does show, however, that the taxpayer never recognized its liability in any amount until it sought to and effected a compromise. This is not exactly parallel with the *Malleable Iron Range Co.* case, *supra*, but the reasoning of the court in that case seems to be applicable here.

Section 234(a)(4) of the Revenue Act of 1921 contains these words:

Losses sustained during the taxable year and not compensated for by insurance or otherwise; unless, in order to clearly reflect the income, the loss should in the opinion of the Commissioner be accounted for as of a different period.

Even if this might be construed to authorize the Commissioner to allocate losses actually sustained in 1921 to prior years, it does not seem to be applicable in the present case for the reason that there is nothing in the record which seems to connect this loss in any way with the production of gross income in the years 1918, 1919, or 1920. We have therefore arrived at the conclusion that no part of that loss may be properly deducted from gross income for any of the years here under consideration.

While we are generally ready to concede that a going business conducted successfully for a number of years, which has produced profits, and which shows a comparatively steady growth, develops a good will and that such good will when transferred to a successor must have a capital value. Such capital value, however, must be established by evidence segregating and distinguishing good will value from the values inherent in other assets, both tangible and intangible. The business of the two predecessor concerns which were taken over by the taxpayer was built up entirely upon the basis of manufacturing and selling articles protected by patent monopoly, and the testimony in the present case does not clearly distinguish between the intangible capital values inherent in the patent monopoly and any values pertaining to good will. We are, therefore, of the opinion that neither the good will values claimed by the taxpayer nor any part thereof has been established by the evidence.

The value of patents at any given date is, like the value of other property, a question of fact which must be determined upon the evidence. In the *Appeals of Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179; *Gamon Meter Co.*, 1 B. T. A. 1124, and *J. J. Gray, Jr.*, 2 B. T. A. 672, the Board has laid down the rule that in determining the value of patents at any basic date it would take into consideration the history and the volume of profits produced by the use of patents, the opinion testimony of men experienced in dealings in patents and in the products protected by the patent monopoly and would also consider the subsequent history of such patents, together with the volume of profits produced by their use in the business, and upon the basis of such evidence determine the value at the basic date.

In the instant case the Commissioner took the average profits produced by the predecessor enterprises during the period of 5 years immediately preceding January, 1916, when the group of seven patents had an average remaining life of 7 years and the group of four patents had an average remaining life of almost their whole term of 17 years, and that the two groups together had an average life of approximately 11 years and, applying a well known annuity formula, produced a value of $86,000 at the basic date, January 18, 1916. If the Commissioner had taken the average profits of the 5 subsequent years when the first group of 7 patents had a remaining life of approximately 4 years, the group of four patents had a remaining life of approximately 12 years, and the average remaining life of all of the two groups was approximately 7 years, and had applied the same formula, he would have found that these patents in January, 1921, had a value of $423,000. It is no doubt entirely possible that there may be cases in which a group of patents on one date might be worth $86,000 and that five years later the

same patents might be worth $423,000, but under all the facts appearing in the record of this case we are convinced that so wide a spread between the values at two different dates must produce a doubt as to the application of the formula adopted by the Commissioner.

In the instant case the record contains the testimony of two business men who were also inventors and had produced part of the patents here in question. These men have lived with these patents and the business in which they are used for a number of years. Their private fortunes and their life work are staked upon the successful outcome of a business devoted entirely to the production and sale of articles protected by these patent monopolies. On January 18, 1916, the group of seven patents had been tried and proven by years of successful operation, and on that date these men in reorganizing their business determined that this group of seven patents had a value of $178,335.63. The group of four patents were new and little tried. They were, however, related to the same general character of business as the preceding group of seven patents. They evidenced improvements along the same general lines of manufacture of patented articles. At the time of the transfer of these four patents and inventions to the taxpayer these men were not only conversant with all the past history of the business using such patents but they were also cognizant of the then present conditions of the industries using ball bearings. They knew the industrial field within which such articles as they had produced and proposed to produce could be used. They already controlled a considerable percentage of the business in twenty-two separate lines of industry. They knew the history of these industries and, on the basis of such history, they could estimate the probable growth and expansion of such industry and, therefore, of the increased demand for ball bearings. They were able at that time to sense the future of the properties which they owned and which they transferred to the taxpayer corporation, and they then in the exercise of their experienced judgment as business men placed a valuation on these four patents and inventions in the amount of $150,000. That they were capable appraisers of such values we believe must be accepted without question.

Now, let us see whether subsequent events as disclosed by this record tend to support or to disprove the appraisal then made by them. During the five years of 1916 to 1920, inclusive, the taxpayer corporation carrying on the manufacture and sale of articles protected by these eleven patents produced net gains and profits aggregating $628,013.74. If, then, we assume that this taxpayer had, at or near the beginning of the year 1916, purchased this group of patents for a cash consideration of $328,335.63, and had acquired

the business in which such patents were used and had conducted such business during the following five years with the same results as to profits, it could have disposed of such profits as follows:

| | |
|---|---:|
| Total profits produced | $628,013.74 |
| Amount necessary to pay 8 per cent on average cost of tangible properties employed in business | 105,457.93 |
| Balance | 522,555.81 |
| Amount necessary to repay or amortize cost of patents | 328,335.63 |
| | 194,220.18 |

This balance is equal to an annual average of $38,844.04, which will pay an 8 per cent annual dividend on $485,550. The total increase of tangible assets during the 5 years was $407,720.52. The company could have issued and sold stock for this amount and more and paid an annual dividend of 8 per cent thereon. It thus appears that during these 5 subsequent years the purchasers of these patents could have amortized their entire cost and still have had possession of the patent monopoly inherent in the group of seven patents for the further period of 4 years and in the group of four patents for the further period of approximately 12 years. We are thus convinced that the estimate of values placed upon these patents in 1916 was conservative and safe and that if the patents had been in the market a prudent buyer could have safely offered to pay the values claimed by the taxpayer. We have, therefore, found that the group of seven patents had a value on January 18, 1916, in the amount of $178,335.63, and that the group of four patents and inventions had a value on the date they were transferred to the taxpayer in the amount of $150,000. In the computation of a deduction for the exhaustion of these capital values, the total values found for the group of seven patents should be distributed and assigned to the several patents in the amounts shown in the findings of fact, and the total of $150,000 found to be the value of the group of four patents and inventions may be segregated and assigned to each patent or invention in the amounts elected by the taxpayer.

*Order of redetermination of deficiencies in accordance with the foregoing findings of fact and opinion will be made on 15 days' notice, pursuant to Rule 50.*