*495 OPINION.
Tbits sell :
In view of the evidence we are of the opinion that the statute of limitations had run against the year 1916 and that there is no deficiency for that year.
The Commissioner urged, in support of his motion to dismiss the appeal for the year 1917, the fact that an assessment of the claimed deficiencies had been made prior to June 2, 1924. This motion was denied at the time of the hearing on the basis of the Board’s decision in the Appeals of E. J. Barry, 1 B. T. A. 156, and Hickory Spinning Co., 1 B. T. A. 409, and that conclusion is now affirmed in accordance with section 283(f) of the Revenue Act of 1926.
In the case of the Malleable Iron Range Co. v. United States, 62 Ct. Cls. 425, the Court of Claims had under consideration a situation where the plaintiff sought in its income-tax return for the year 1918 to deduct the amount of the judgment rendered against it during that year but in respect to which the plaintiff then took an appeal which was not finally determined and settled until the year 1920, and the court held that, inasmuch as the plaintiff in that case never acknowledged the liability until the appeal was determined, it could not accrue any amount on account of said judgment while its appeal was pending and unsettled. The record in the instant case does not show when the litigation which was compromised and settled in 1921 was actually begun. It does show, however, that the taxpayer never recognized its liability in any amount until it sought to and effected a compromise. This is not exactly parallel with the Malleable Iron Range Co. case, supra, but the reasoning of the court in that case seems to’be applicable here.
Section 234(a) (4) of the Revenue Act of 1921 contains these words:
Losses sustained during the taxable year and not compensated for by insurance or otherwise; unless, in order to clearly reflect the income, the loss should in the opinion of the Commissioner be accounted for as of a different period.
Even if this might be construed to authorize the Commissioner to allocate losses actually sustained in 1921 to prior years, it does not seem to be applicable in the present case for the reason that there is nothing in the record which seems to connect this loss in any way with the production of gross income in the years 1918, 1919, or 1920. We have-therefore arrived at the conclusion that no part of that loss may be properly deducted from gross income for any of the years here under consideration.
*496 While we are generally ready to concede that a going business conducted successfully for a number of years, which has produced profits, and which shows a comparatively steady growth, develops a good will and that such good will when transferred to a successor must have a capital value. Such capital value, however, must be established by evidence segregating and distinguishing good will value from the values inherent in other assets, both tangible and intangible. The business of the two predecessor concerns which were taken over by the taxpayer was built up entirely upon the basis of manufacturing and selling articles protected by patent monopoly, and the testimony in the present case does not clearly distinguish between the intangible capital values inherent in the patent monopoly and any values pertaining to good will. We are, therefore, of the opinion that neither the good will values claimed by the taxpayer nor any part thereof has been established by the evidence.
The value of patents at any given date is, like the value of other property, a question of fact Avhich must be determined upon the evidence. In the Appeals of Dwight & Lloyd, Sintering Co., 1 B. T. A. 179; Gamon Meter Co., 1 B. T. A. 1124, and J. J. Gray, Jr., 2 B. T. A. 672, the Board has laid down the rule that in determining the value of patents at any basic date it would take into consideration the history and the volume of profits produced by the use of patents, the opinion testimony of men experienced in dealings in patents and in the products protected by the patent monopoly and Avould also consider the subsequent history of such patents, together with the volume of profits produced by their use in the business, and upon the basis of such evidence determine the value at the basic date.
In the instant case the Commissioner took the average profits produced by the predecessor enterprises during the period of 5 years immediately preceding January, 1916, when the group of seven patents had an average remaining life of 7 years and the group of four patents had an average remaining life of almost their whole term of 17 years, and that the two groups together had an average life of approximately 11 years and, applying a well known annuity formula, produced a value of $86,000 at the basic date, January 18, 1916. If the Commissioner had taken the average profits of the 5 subsequent years when the first group of 7 patents had a remaining life of approximately 4 years, the group of four patents had a remaining life of approximately 12 years, and the average remaining life of all of the two groups was approximately 7 years, and had applied the same formula, he would have found that these patents in January, 1921, had a value of $423,000. It is no doubt entirely possible that there may be cases in which a group of patents on one date might be worth $86,000 and that five years later the *497 same patents might be worth $423,000, but under all the facts appearing in the record of this case we are convinced that so wide a spread between the values at two different dates must produce a doubt as to the application of the formula adopted by the Commissioner.
In the instant case the record contains the testimony of two business men who were also inventors and had produced part of the patents here in question. These men have lived with these patents and the business in which they are used for a number of years. Their private fortunes and their life work are staked upon the successful outcome of a business devoted entirely to the production and sale of articles protected by these patent monopolies. On January 18, 1916, the group of seven patents had been tried and proven by years of successful operation, and on that date these men in reorganizing their business determined that this group of seven patents had a value of $178,335.63. The group of four patents were new and little tried. They were, however, related to the same general character of business as the preceding group of seven patents. They evidenced improvements along the same general lines of manufacture of patented articles. At the time of the transfer of these four patents and inventions to the taxpayer these men were not only conversant with all the past history of the business using such patents but they were also cognizant of the then present conditions of the industries using ball bearings. They knew the industrial field within which such articles as they had produced and proposed to produce could be used. They already controlled a considerable percentage of the business in twenty-two separate lines of industry. They knew the history of these industries and, on the basis of such history, they could estimate the probable growth and expansion of such industry and, therefore, of the increased demand for ball bearings. They were able at that time to sense the future of the properties which they owned and which they transferred to the taxpayer corporation, and they then in the exercise of their experienced judgment as business men placed a valuation on these four patents and inventions in the amount of $150,000. That they were capable appraisers of such values we believe must be accepted without question.
Now, let us see whether subsequent events as disclosed by this record tend to support or to disprove the appraisal then made by them. During the five years of 1916 to 1920, inclusive, the taxpayer corporation carrying on the manufacture and sale of articles protected by these eleven patents produced net gains and profits aggregating $628,013.74. If, then, we assume that this taxpayer had, at or near the beginning of the year 1916, purchased this group of patents for a cash consideration of $328,335.63, and had acquired *498 the business in which such patents were used and had conducted such business during the following five years with the same results as to profits, it could have disposed of such pi’ofits as follows:
Total profits produced_$628, 013. 74
Amount necessary to pay 8 per cent on average cost of tangible properties employed in business_ 105,457.93
Balance_ 522, 555. 81
Amount necessary to repay or amortize cost of patents- 328, 335. 63
194, 220.18
This balance is equal to an annual average of $38,844.04,.which will pay an 8 per cent annual dividend on $485,550. The total increase of tangible assets during the 5 years was $407,720.52. The company could have issued and sold stock for this amount and more and paid an annual dividend of 8 per cent thereon. It thus appears that during these 5 subsequent years the purchasers of these patents could have amortized their entire cost and still have had possession of the patent monopoly inherent in the group of seven patents for the further period of 4 years and in the group of four patents for the further period of approximately 12 years. We are thus convinced that the estimate of values placed upon these patents in 1916 was conservative and safe and that if the patents had been in the market a prudent buyer could have safely offered to pay the values claimed by the taxpayer. We have, therefore, found that the group of seven patents had a value on January 18, 1916, in the amount of $178,335.63, and that the group of four patents and inventions had a value on the date they were transferred to the taxpayer in the amount of $150,000. In the computation of a deduction for the exhaustion of these capital values, the total values found for the group of seven patents should be distributed and assigned to the several patents in the amounts shown in the findings of fact, and the total of $150,000 found to be the value of the group of four patents and inventions may be segregated and assigned to each patent or invention in the amounts elected by the taxpayer.
Order of redetermination of deficiencies in accordance with the foregoing findings of fact and opinion will be made on 15 days’ notice, pursuant to Bule 50.